# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PREMIER COMP SOLUTIONS, LLC** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 07-1764 |
| | ) | |
| **PENN NATIONAL INSURANCE CO.;** | ) | |
| **INSERVCO INSURANCE SERVICES,** | ) | |
| **INC.; HOOVER REHABILITATION** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| Defendants, | | |

## MEMORANDUM OPINION

**CONTI, District Judge.**

Pending before this court is a motion for partial summary judgment (the "Motion", ECF No. 91) filed by defendants Penn National Insurance Co. ("PNI"), Inservco Insurance Services, Inc. ("Inservco"), and Hoover Rehabilitation Services, Inc. ("Hoover") (collectively, "defendants"). Plaintiff Premier Comp Solutions, LLC. ("Premier" or "plaintiff") filed this action in state court asserting a claim under the Lanham Act, 15 U.S.C. § 1125, for false statement (count V) and various claims under state law, *i.e.*, count I (unfair competition), count II (tortious interference), count III (fraud), count IV (conspiracy), and count VI (business libel) (ECF No. 1). This case was removed by defendants to this court. Because the court, after considering all the parties' submissions, concludes no reasonable jury could render a verdict in favor of plaintiff with respect to the Lanham Act claim, the court will grant the Motion with respect to count V with prejudice, deny the motion without prejudice with respect to the state law

1

claim for business libel (count VI) and will remand this case to the Court of Common Pleas of Allegheny County, Pennsylvania.

I. **Factual background**[1]

Premier initiated this action on December 6, 2007, by filing a complaint against defendants in the Court of Common Pleas of Allegheny County, Pennsylvania. On December 28, 2007, this action was removed by defendants to this court. ECF No. 1.

Premier is a Pennsylvania limited liability company "whose services include the development of functional panels of healthcare providers, injury management, discontinued physical therapy and diagnostic networks, medical bill review, and repricing services." ECF No. 128 at 4. PNI is a Pennsylvania mutual insurance company that provides workers' compensation insurance coverage to employers. Id. at 4, 22. Inservco, a Pennsylvania corporation wholly owned by PNI, offers third-party administration services to risk pool or self-insured employers. Id. Hoover, a Pennsylvania corporation, is a "health and disability company that has a contract with PNI and Inservco to perform medical bill review, repricing, and nurse case management services." Id.

On January 25, 2006, a PNI and Inservco employee located in Harrisburg, Pennsylvania, Karen Lord ("Lord'), ECF No. 91-3 at 4, sent an email to a number of defendants' employees,[2] with the subject header "Payments to Premier Comp Solutions & Similar Providers" ("January 25, 2006 e-mail" or "Lord's email"). ECF No. 128 at 4-5. The text of the email at issue here reads as follows:

---

[1] The facts set forth here pertain only to the issues relevant to the Lanham Act claim.
[2] The email was sent or copied to thirteen individuals who were employed by Inservco or Hoover, including: Joseph Holland, Darlene Fleisher, Cynthia Reinhart, Randolph Stroup, Dean Crossland, Michael R. Watts, Michael Wasliewski, Ken Garcia, Larry Warren, Staci Ulp and three other individuals. ECF No. 102 at 2. There is evidence that several of these employees were located in Pennsylvania. ECF No. 91-3 at 7. The record does not contain evidence that any of these employees were located outside of Pennsylvania.

2

> Ladies and Gentlemen, Inservco recently brought a situation to my attention regarding the use of Premier Comp. In exploring the situation I have uncovered some information that you need to be made aware of. First we should not issue any future payments to Premier Comp, they are not a provider of service, the reason for this is that the billings being received from Premier Comp have their tax id but another provider's Medicare number, as a result they may be committing Medicare fraud. My understanding is that the FBI is currently reviewing this situation. When we receive these bills we should deny payment. Premier Comp cannot file a fee review as they are not the provider of service. If and when we receive a bill from the actual provider of service, have the bill repriced and paid to the provider of service. I am asking Hoover to return all bills where the tax id and Medicare provider numbers do not match. When you receive bills back for this reason please send a denial of charges to the billing party. The reason for the denial should be that the billing party is not the provider of service as required by the WC Act. This email basically addresses the Premier Comp situation, however you should apply the same logic to all similar bills received for payment. If you question whether or not a bill falls into this category please contact me for assistance.
>
> If you have any question please feel free to give me a call. I trust that you will share this information with all of your claim handlers.
>
> Thanks, Karen
>
> PS: as a heads up I suspect that Universal Smart Comp fall [sic] into the category discussed above.

ECF Nos. 91-2; 106-3 at 2.

The statements in the email that Premier may be committing Medicare fraud and that the FBI was reviewing the situation were false. ECF No. 128 at 36.

Staci Ulp ("Ulp"), one of the individuals that received Lord's email, is the Regional Vice-President for Inservco and responsible for Pennsylvania accounts. ECF Nos. 91-6 at 3; 107-3 at 21; 128 at 7. Ulp, in turn, on the same day, forwarded that email to a number of individuals. ECF Nos. 106-4; 128 at 38.[3]

Jack Maher ("Maher"), a claims adjustor with Inservco, was one the recipients of the email forwarded by Ulp. ECF No. 128 at 7, 9. Maher works in Pennsylvania. Id. at 9. Maher

---

[3] The parties agreed that the individuals who received the forwarded email were Inservco's adjustors and Hoover's employees. ECF No. 128 at 7.

discussed the email with Toni Roberts ("Roberts"), who is the Executive Director and owner of "The Workforce," located in the Pittsburgh, Pennsylvania area, ECF No. 91-8 at 3, and a consultant to the Municipality of Monroeville, Pennsylvania. ECF Nos. 91-4 at 5; 106-16 at 4. At that time, the Municipality of Monroeville was a member of PennPRIME Trust, a risk-pool of municipal employees.[4] ECF No. 128 at 32. Maher recalls discussing the content of that email with Roberts, but could not say what the conversation was about. ECF Nos. 91-4 at 5-6; 106-16 at 6-7. Roberts had contacted Maher to find out why Inservco stopped paying Premier's invoices to Monroeville Borough. ECF No. 106-17 at 3. Maher told Roberts that he had been instructed by the "people superior to him" within Inservco not to pay Premier's invoices. Id. at 4. Roberts testified that Maher read or paraphrased portions of an email he had received in which Maher was told not to pay Premier's invoices because Premier was under investigation for Medicare fraud. Id. at 5.

Roberts discussed this conversation with her staff and Linda Schmac ("Schmac"), plaintiff's president and founder. ECF No. 128 at 10. In Roberts' conversation with Schmac, they discussed what Roberts would say to Susan Werksman ("Werksman"), the director of personnel and finance for the Municipality of Monroeville, located in Monroeville, Pennsylvania, about the content of the email. ECF Nos. 91-8 at 7-8; 91-9; 93 at 4; 103 at 6; 106-17. Roberts discussed Lord's email with Werksman. ECF Nos. 91-8 at 7; 106-17 at 9. Werksman recalled talking with Roberts over the phone and being informed by Roberts that Inservco discontinued paying Premier's invoices. ECF No. 91-9 at 4. Werksman also had a conversation with Schmac in which Schmac told Werksman about an email from Inservco

---

[4] In its complaint, Premier describes PennPRIME as "the administrator of an employer pool made up of local governmental agencies." ECF No. 1 at 12.

4

concerning unfounded allegations about an investigation of Premier for Medicare or Medicaid fraud. ECF Nos. 91-9 at 5-6; 106-15 at 9.

Ulp discussed Lord's email with Olivia Zitelli ("Zitelli"), the Director of Human Resources of Turtle Creek Valley Mental Health Mental Retardation, Inc. ("Turtle Creek"), located in Braddock, Pennsylvania. ECF Nos. 128 at 14, 57. Turtle Creek is a member of the PCPA[5] Trust. ECF No. 128 at 58. Zitelli testified that in July 2006 she asked Ulp what was the problem with Premier. ECF Nos. 91-10 at 5; 128 at 60. Ulp told her that Premier's business model was not ethical because Premier used providers they were not allowed to use under Pennsylvania's Workers' Compensation Act ("WCA"). She advised that Inservco would not be involved in that conduct. ECF Nos. 91-10 at 5; 107-7 at 10-11, 14. Zitelli testified that she was "80%" certain that Ulp told her that Premier was committing Medicare fraud. ECF Nos. 91-10 at 7; 107-7 at 13; 128 at 14-15.

Zitelli, in turn, "probably" told Bill Lehr ("Lehr"), a consultant and executive representative for the PCPA Trust, about her conversation with Ulp. ECF Nos. 91-10 at 5; 107-7; 128 at 15. Sometime in 2006, the PCPA Trust entered into contract with Inservco. Under the contract, Inservco was to provide third-party administrator ("TPA") services to PCPA Trust. ECF No. 128 at 59-60. In an email to Eugene Barilla ("Barilla"), Premier's marketing director, Lehr told Barilla that the PCPA Trust's policy is to pay all medical charges directly to providers, but not TPAs. Id. at 63. During his deposition, Leher stated that there was not in fact such a policy. Id. 64. Any change in the way the PCPA Trust would handle medical bills coincided with Inservco becoming the TPA provider of PCPA. Id. at 63.

Ulp once "likely" discussed the content of Lord's email with George Price ("Price"), the Director of Risk Management for Penn PRIME. ECF No. 91-7 at 4. Price recalled that Ulp told

---

[5] PCPA stands for "Pennsylvania Community Provider Association." ECF No. 1 at 12.

him that there was some allegation that Premier was being investigated by the FBI. Id. at 5; ECF No. 106-18 at 3. Ulp, however, did not state it was a fact, but just an "innuendo" or a "rumor." Id. at 106-18 at 5-6. Price did not tell anyone about the conversation with Ulp because he was not certain it was true. ECF No. 91-7 at 6. Price, however, talked with Gary Scoulos, Premier's legal counsel, about the reason provided by Inservco for not paying Premier, *i.e.*, "only medical providers can be reimbursed for services." ECF Nos. 106-6 at 1; 128 at 41. In an email to Ulp, Price asked Ulp to share with him any writing in which PNI formalized its position with respect to payments to Premier. Id. No such writing was ever provided. Id. In February 2006, Price sent Werksman a copy of portions of the WCA relevant to the issue whether Premier is a provider under the WCA. ECF No. 128 at 42. Price stated that he was directed to these sections by Ulp. Id. at 42-3.

With respect to the nature of Premier's business, Schmac submitted an affidavit, ECF No. 108-1, in which she averred: "Premier has the ability to provide medical bill review, repricing, and workers' compensation Preferred Provider Organization ("PPO") network access services in all 50 states and markets these services to national, regional, and local employers, insurance carriers, and third party administrators." ECF No. 108-1 at 13. Premier also provided services to employers with locations outside of Pennsylvania. See ECF Nos. 108-1 at 16; 108-3. Premier receives referrals from employers who are located outside of Pennsylvania. ECF Nos. 108-1 at 16; 108-4. Exhibits B and C referred to in Schmac's affidavit list hundreds of employers to whom Premier provided services or from whom Premier received referrals. ECF Nos. 108-3; 108-4. Schmac reported that Inservco listed 600 clients on its website. ECF No. 108-1 at 15.

## II. Standard of Review

A motion for summary judgment is governed by Federal Rule of Civil Procedure 56, which provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1).

The Court of Appeals for the Third Circuit instructed in Marten v. Godwin, 499 F.3d 290 (3d Cir. 2007), that Rule 56 of the Federal Rules of Civil Procedure:

> "[M]andates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Id. at 295 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. See Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### III. Discussion

#### A. Lanham Act Claim

In count V, plaintiff alleges defendants' conduct violated § 1125 of the Lanham Act (false or misleading statements and other prohibited conduct). The relevant provisions of § 1125 provide as follows:

8

> (1) <u>Any person who</u>, on or in connection with any goods or services, or any container for goods, <u>uses in commerce</u> any word, term, name, symbol, or device, or any combination thereof, or <u>any</u> false designation of origin, false or misleading description of fact, or <u>false or misleading representation of fact</u>, <u>which</u>--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) <u>in commercial advertising or promotion, misrepresents the nature, characteristics, qualities</u>, or geographic origin <u>of</u> his or her or <u>another person's</u> goods, <u>services, or commercial activities</u>,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added). Plaintiff alleges that false statements about Premier (i.e., Premier may be committing Medicare fraud and the FBI was reviewing that situation) were used by defendants when dealing with defendants' clients or plaintiff's clients. There is no indication in any of plaintiff's submissions that there was any confusion about a connection, affiliation, association with another person or about the origin, sponsorship or approval of plaintiff's services by another person. Therefore, plaintiff cannot be raising a claim under § 1125(a)(1)(A). Plaintiff's Lanham Act claim is raised under § 1125(a)(1)(B), which deals with misrepresentations in commercial advertising or promotion. Defendants argue that plaintiff failed to adduce evidence that the misrepresentations in Lord's email were used in commerce and that summary judgment in their favor must be granted with respect to the Lanham Act claim.

1. "Uses in Commerce"

With respect to the issue concerning the requirement of "uses in commerce," the court agrees with plaintiff that the commerce requirement has been broadly interpreted to include even purely intrastate activity – *if that activity substantially affects interstate commerce*. <u>Highmark, Inc. v. UPMC Health Plan, Inc.</u>, 276 F.3d 160, 165 (3d Cir. 2001) (false advertisement's

9

substantial affect on interstate commerce shown, among other things, by the use of the advertisement in a newspaper that was distributed out-of-state) (emphasis added).

The term "commerce" is defined in the Lanham Act to mean "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Congress may regulate interstate commerce. United States v. Lopez, 514 U.S. 549, 558-59 (1995). In 1989 there was an amendment to § 1125(a) which changed the focus of "uses in commerce" from the goods or services to which a misrepresentation related being used in commerce to the misrepresentation itself being used in commerce.

> [P]rior to the 1989 amendment, the goods or services which were marked or about which statements were made had to be used in interstate commerce. In the 1989 amendment [to § 1125(a)], the focus was shifted from the goods or services being used in interstate commerce to the designation or advertisement [i.e., the misleading representation] being used in interstate commerce. This is a subtle change that will probably make no difference except in a case with unusual facts. After 1989 what is needed is that a person, in connection with goods or services, uses in "commerce" a designation or a misleading representation that violates [§ 1125(a)]. . . . Even an accused designation or advertisement that is circulated purely intrastate is captured by [§ 1125(a)] if that accused activity substantially affects interstate commerce.

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 27:47, at 27-100 (4th ed. 1999) ("McCarthy on Trademarks") (emphasis added and footnotes omitted).

Defendants argue that plaintiff presented no evidence that the email containing the misrepresentations or oral communications about those misrepresentations were sent to or received by anyone located outside Pennsylvania. Plaintiff contends that, even though the email or oral communications may not have been sent or received by persons located outside Pennsylvania,[6] over the years, plaintiff has: (i) "scheduled hundreds of appointments for

---

[6] Plaintiff also asserts that "the email or information in the email was disseminated to persons outside of Pennsylvania." ECF No. 128 at 7 (citing ECF Nos. 107-3 and 117 for the proposition that the email or information was in fact received by Nancy Fowlkes ("Fowlkes"), an Inservco employee, in New Jersey). In its own brief, however, plaintiff acknowledges that the January 25, 2006 email was "likely" received by Fowlkes. ECF No. 104 at

companies located outside Pennsylvania who insure employers located both inside and outside of Pennsylvania with employees (claimants) who reside out of Pennsylvania and who were sent for treatment to providers located out of Pennsylvania," ECF Nos. 108-1 at 16; 108-2; (ii) provided services to hundreds of employers with locations outside of Pennsylvania, ECF No. 108-3; (iii) received hundreds of referrals from employers who are located outside Pennsylvania, ECF No. 108-4; (iv) scheduled hundreds of physical therapy treatment appointments with physical therapy providers located outside Pennsylvania, ECF No. 108-5; and (v) scheduled MRI appointments with MRI providers located outside of Pennsylvania, ECF No. 108-6. Plaintiff, however, did not point to one of those employees, employers or providers who were located outside Pennsylvania as having received the email or having been told about the misrepresentations made in the email. Based on this record, the intrastate activity of sending one email to defendants' employees located within Pennsylvania and the oral dissemination of false information contained in that email to five other persons located in Pennsylvania with no other showing of an affect on interstate commerce by that intrastate activity is insufficient to meet the "uses in commerce" requirement. Plaintiff needed to adduce some evidence to show that the misrepresentations in issue were made in interstate commerce or, if purely made intrastate, affected interstate commerce. Plaintiff must adduce evidence of more than general information about the nature of plaintiff's interstate business.

Plaintiff did not point to any evidence showing that the misrepresentations affected its interstate business. As noted, there was no evidence that non-Pennsylvania employers,

---

25, ¶ 181. A review of the evidence offered by plaintiff reveals that Fowlkes was in fact an Inservco New Jersey adjustor, ECF Nos. 107-3 at 11, 22; 117 at 2, but the evidence adduced is insufficient for a reasonable jury to find that Fowlkes received the email. To reach the conclusion desired by plaintiff, a jury would have to speculate Fowlkes received the email. Rackzkowski v. Empire Kosher Poultry, 185 F. App'x 117, 118 (3d Cir. 2006) ("if the non-movant's evidence is merely speculative, conclusory, 'or is not significantly probative, summary judgment may be granted.'") (quoting Anderson, 477 U.S. at 249-50).

11

employees or providers knew about the alleged misrepresentations or that Premier's out-of-state business was affected by those misrepresentations. In Lewis v. Marriott Intern. Inc., 527 F. Supp. 2d 422 (E.D. Pa. 2007), in the context of a motion to dismiss, the district court addressed the "uses in commerce" requirement. It found that the alleged use of a renowned chef's name by a hotel in Philadelphia in materials to sell wedding packages could support, at the motion to dismiss stage, a Lanham Act claim because there were allegations in the complaint sufficient to infer that customers in New Jersey and Delaware would plan a wedding in Philadelphia. Here, the court is faced with a summary judgment motion and, unlike Lewis, there were no materials containing the misrepresentations which were used by defendants to market their services and plaintiff did not show that any of its business from out-of-state clients or their employees was affected by the misrepresentations. General information about the interstate nature of plaintiff's business at the summary judgment state is insufficient in light of the 1989 amendments to the Lanham Act.[7]

This case is one of the "unusual cases" where the 1989 amendment makes a difference. 5 McCarthy on Trademarks § 27:47. Plaintiff has the burden on this issue and failed to adduce evidence that the misrepresentations in issue for purposes of the § 1225(a)(1)(B) claim affected interstate commerce. See, e.g., Connection Training Servs. v. City of Phila., 385 F. App'x 315 (3d Cir. 2009).[8] Because plaintiff failed to meet its burden to adduce evidence that the

---

[7] See Laurel Capital Group, Inc. v. BT Financial Corp., 45 F. Supp. 2d 469, 478 (W.D. Pa. 1999), "For the [Lanham] Act to apply, the *mark itself* [here the false statements] must be used in interstate commerce; it is insufficient that the parties' *business* is, by its nature, interstate or is one that effects interstate commerce. Very few courts have taken notice of this distinction." (emphasis in original) (citing Licata & Co., Inc. v. Goldberg, 812 F. Supp. 403 (S.D. N.Y. 1993)).

[8] In Connection Training Services, the court of appeals held:

> If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate. [*Matsushita*, 475 U.S. at 586]. To avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A genuine issue of material fact

12

misrepresentations in issue affected interstate commerce, judgment must be entered in favor of defendants with respect to the Lanham Act claim.

    2.    <u>Commercial Advertising or Promotion</u>

Even assuming plaintiff could come forward with evidence to meet the "uses in commerce" requirement, there is an alternative basis on which summary judgment must be granted in favor of defendants with respect to the Lanham Act claim based upon a false statement.[9] In <u>Pitney Bowes, Inc. v. ITS Mailing Systems Inc.</u>, No. 09-cv-05024, 2010 U.S. Dist. LEXIS 24710, at *13-14 (E.D. Pa. Mar. 17, 2010), the district court noted:

> The threshold matter in addressing an alleged false statement actionable under 15 U.S.C. § 1125(a)(1)(B) is whether the statement constitutes "commercial advertising or promotion." *Synygy, Inc. v. Scott-Levin*, 51 F. Supp. 2d 570, 576 (E.D. Pa. 1999) (quoting 15 U.S.C. § 1125(a)(1)(B)). In the absence of an express definition of "commercial advertising or promotion" in the Lanham Act, courts have developed a four element test to define these terms in accordance with the Act's language and congressional intent. *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 455-56 (D. N.J. 2009) (discussing the development of this definition first in *Gordon & Breach Sci. Publishers v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1537 (S.D. N.Y. 1994) and subsequently in *Seven-Up v. Coca-Cola*, 86 F.3d 1379, 1383 n.6, 1384 (5th Cir. 1996)); *Synygy, Inc.*, 51 F. Supp. 2d at 576; *Caldon, Inc. v. Advanced Measurement & Analysis*

---

exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. [*Anderson*, 477 U.S. at 248]. Summary judgment is appropriate if the non-movant fails to make a showing sufficient to establish the existence of an element essential to its case. *Celotex,* 477 U.S. at 322-23, 106 S.Ct. 2548.

<u>Connection Training Servs.</u>, 358 F. App'x at 318.

[9] To establish a false advertising claim under the Lanham Act, a plaintiff must prove:

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.
>
> *Warner–Lambert v. Breathasure*, 204 F.3d 87, 91–92 (3d Cir. 2000) (citing *Johnson & Johnson– Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc*., 19 F.3d 125, 129 (3d Cir. 1994)).

<u>Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.</u>, 653 F.3d 241, 248 (3d Cir. 2011). If the misrepresentation is "literally false", deception does not have to be proven. <u>Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc</u>., 19 F.3d 125, 129 (3d Cir. 1994).

> *Group, Inc.*, 515 F. Supp. 2d 565, 578 (W.D. Pa. 2007) ("In deciding whether representations were commercial advertising or promotion within the Lanham Act, courts in this jurisdiction apply the test from Seven-Up v. Coca-Cola Co"). "Commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) <u>that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry</u>." *Synygy, Inc*., 51 F. Supp. 2d at 576; see also McCarthy on Trademarks § 27:71. <u>Only after determining that the relevant statement constitutes commercial advertising or promotion would a court consider the remaining elements of a Lanham Act claim based on a false or misleading representation of a product under 15 U.S.C. § 1125(a)(1)(B)</u>.

Id. at *13-14 (emphasis added).

The court views the issue whether plaintiff can establish the fourth factor – the false statements in the email were "sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry," <u>id.</u>, as also being dispositive of the Lanham Act claim.

The Court of Appeals for the Third Circuit has not considered what evidence is needed to show commercial advertising or promotion. Various district courts in the Third Circuit, however, have considered that issue. <u>See</u>, <u>e.g.</u>, <u>ConsulNet Computing, Inc. v. Moore</u>, No. 04-cv-3485, 2007 WL 2702446 at *11 (E.D. Pa. Sept. 12, 2007); <u>Diamond Triumph Auto Glass, Inc., v. Safelite Glass Corp</u>., 441 F. Supp. 2d 695, 706 (M.D. Pa. 2006); <u>Synygy, Inc. v. Scott-Levin</u>, Inc., 51 F. Supp. 2d. 570, 576-77 (E.D. Pa. 1999), <u>aff'd</u>, 229 F.3d 1139 (3d Cir. 2000). The district court in <u>TriState HVAC Equipment, LLP v. Big Belly Solar, Inc</u>., No. 10-cv-1054, 2011 WL 6372324 (E.D. Pa. Dec. 19, 2011), noted:

> Courts have generally distinguished between "advertising" and "promotion"—"[a]lthough advertising is generally understood to consist of widespread communication through print or broadcast media, 'promotion' may take other forms of publicity used in the relevant industry, such as displays at trade shows and sales presentations to buyers." [*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 57 (2d Cir. 2002)]. "Rather than focusing on widespread impersonal activity, the inquiry focuses on the 'relevant industry' and whether the

communication was sufficiently disseminated in that context." *Gonzalez v. Allstate Ins. Co.*, No. 04–1548, 2005 WL 5891935, at *7 (C.D. Cal. Aug. 2, 2005) (discussing the "teaching of" [*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725 (9th Cir. 1999)], in which the Ninth Circuit "concluded that even though the statements had been made directly to only one potential customer, there was sufficient dissemination to constitute promotion"). Thus, "[w]here the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act." [*Seven-Up v. Coca-Cola*, 86 F.3d 1379, 1386 (5th Cir. 1996))] (concluding that a presentation made to eleven out of seventy-four bottlers constituted "promotion").

Id. at *9.

Advertising is not implicated in this case because there is no evidence of communications in print or broadcast media. Here, the dispositive issue concerns promotion and whether there was sufficient dissemination of the false statements to the relevant purchasing public. There are two statements (misrepresentations that Premier may be committing Medicare fraud and the FBI was reviewing the situation) in issue for purposes of the Lanham Act claim. These statements were divulged initially in writing, via an email only to defendants' employees. Certain of defendants' employees divulged the misrepresentations orally to three individuals, Price, Roberts, a consultant, and Zitelli. A fourth person – Werksman was told the information by Roberts and a fifth person, Lehr, was probably told the information by Zitelli, who worked for a client of plaintiff. Werksman, also spoke with plaintiff's president.[10]

    a. Is disseminating to defendants' employees "promotion" to the relevant purchasing public?

The record reflects that at least thirteen employees of defendants received the January 25, 2006 email. The question is whether the defendants' employees to whom Lord's email was sent or forwarded are the "relevant purchasing public." The issue whether and under what

---

[10] Plaintiff also argued that the "emails could have 'gone viral' during the week following the date on whatever network of computers the people who received them were using." ECF No. 128 at 71. This stament is not supported by any evidence and amounts to pure speculation.

circumstances representations to a defendant's employees falls within the reach of the Lanham Act depends upon "what is being offered and to whom it is being offered," In re Canadian Pacific Ltd., 754 F.2d 992, 995 (Fed. Cir. 1985), which in turn depends upon whether the employee is a member of the relevant buying public and benefits from the conduct. Id. at 994. Here, Inservco is a third-party administrator, which offers its services to risk pool or self-insured employers. Hoover provides services to Inservco and also to PNI, which provides workers' compensation insurance coverage to employers. Employees of Inservco and PNI are not risk pool or self-insured employers or employers buying workers' compensation insurance and could not be interested in buying plaintiff's services. Employees of Hoover, which provides the same services as plaintiff, would not be interested in purchasing plaintiff's services. Defendants' employees, therefore, are not part of the relevant buying public. There is no evidence that any of defendants' employees benefitted or would have benefited from not doing business with plaintiff. Accordingly, defendants' employees do not qualify as members of the relevant purchasing public.

  b. Is the dissemination to five persons, who were not defendants' employees, sufficient?

The relevant purchasing public here is determined by identifying plaintiffs' clients or potential clients. Except arguably for five individuals, no message (the misrepresentations) was conveyed to the relevant purchasing public – that is, plaintiff's clients or potential clients. No written communication was sent to those five individuals; rather, they received the alleged false information during oral communications. One of those five individuals, Roberts, was a consultant and discussed the email with her client, Werksman, who was employed by a member

16

of the relevant purchasing public. Plaintiff's president also talked with Werksman about the Inservco email.

Plaintiff alleges that it "has the ability to provide . . . services in all 50 states and markets services to national, regional, and local employers, insurance carriers, and TPAs." ECF No. 104 at 2, 28. In support, plaintiff provided several exhibits providing hundreds of names and addresses of current or potential clients. ECF Nos. 108-2, 108-3, 108-4, 108-5, 108-6. Plaintiff also noted Inservco claimed to have 600 clients on its website. In light of that evidence, which was adduced by plaintiff, a reasonable jury would have to conclude the relevant purchasing public consisted of hundreds of persons.

The court must determine whether the five persons who received the information as a matter of law constitutes dissemination to the relevant purchasing public, *i.e.*, is sufficient to constitute commercial promotion.

In <u>Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc</u>., 314 F.3d 48 (2d Cir. 2002), the Court of Appeals for the Second Circuit noted that the district court, relying on <u>Gordon & Breach Science Publishers S.A. v. American Institute of Physics</u>, 859 F. Supp. 1521 (S.D. N.Y. 1994),[11] found that "plaintiff had failed to prove sufficient dissemination [of disparaging

---

[11] In <u>Gordon Breach</u>, the district court stated:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

<u>Gordon Breach</u>, 859 F. Supp. at 1535-36. Those elements have been applied by a number of district courts within the Third Circuit in determining whether commercial advertising or promotion was alleged or shown. See, e.g., <u>CHW Group, Inc. v. Better Business Bureau of N.J., Inc</u>., No. 11-3261, 2012 WL 426292 (D. N.J. Feb. 8, 2012); <u>M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc</u>., No. 97-cv-1568, 2007 WL 979854 (D. N.J. Mar. 30, 2007); <u>Nevyas v. Morgan,</u> 309 F. Supp. 2d 673 (E.D. Pa. 2004).

comments] because it presented only a dozen admissible comments within a purchasing public universe consisting of thousands of customers." Fashion Boutique, 314 F.3d at 54. Based on this finding, the district court held that these statements did not constitute "commercial advertising or promotion" within the meaning of the Lanham Act. The Court of Appeals for the Second Circuit, adopted the first, third and fourth elements of the Gordon & Breach test, but declined to adopt the second element because it was unnecessary for that appeal. In applying a modified test and affirming the district court's holding, the court of appeals stated:

> There is no evidence to suggest that the remaining statements were part of an organized campaign to penetrate the marketplace. Even including the "different line" statements, post-closing statements, and comments made to undercover investigators, Fashion Boutique has presented a total of twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers. Such evidence is insufficient to satisfy the requirement that representations be disseminated widely in order to constitute "commercial advertising or promotion" under the Lanham Act.

Fashion Boutique, 314 F.3d at 58.

In Seven–Up Co. v. Coca–Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996), the plaintiff, Seven-Up Company ("Seven-Up") sued the defendant, Coca-Cola Company ("Coca-Cola"), under the Lanham Act alleging that Coca-Cola had used a false and misleading presentation to convince "cross-franchise" bottlers to switch from 7UP, a Seven-Up product, to Sprite, a Coca-Cola product. Coca-Cola made the presentation to eleven out of the seventy-four "cross-franchise" bottlers. The first issue addressed by the Court of Appeals for the Fifth Circuit was whether Coca-Cola's presentation constituted "commercial advertisement or promotion" for purposes of the Lanham Act. To this end, the court of appeals relied on the standard set forth in Gordon & Breach. Pursuant to that standard, the court focused, inter alia, on whether the

presentation was "*disseminated sufficiently* to the relevant purchasing public" within the relevant market. In Seven-Up, the court of appeals concluded:

> Coca-Cola's presentation, "The Future Belongs to Sprite," falls within the meaning of "commercial advertising or promotion" under § 43(a) of the Lanham Act. Coca-Cola's use of part or all of the presentation materials during negotiations with representatives of the eleven "cross-franchise" bottlers does not constitute merely isolated, individual statements of opinion by a single sales representative to a single customer. The presentation materials in this case were specifically developed and designed by Coca-Cola to target these independent bottlers and convince them, based on comparative sales statistics, to switch from 7UP to Sprite. The promotional presentation that was finally developed, "The Future Belongs to Sprite," comprised as it was of various types of documents, including visual aids such as charts, graphs, and overhead projections, may only have been shown in its entirety to two bottlers. Nevertheless, this presentation, even if used only in part, is a far cry from the individualized comments held by some courts to fall outside the meaning of commercial advertising or promotion under the Act.
>
> At the time "The Future Belongs to Sprite" was created, the seventy-four "cross-franchise" bottlers targeted by the Coca-Cola presentation were the only relevant potential "consumers" or "purchasing public" for this intermediate product. Coca-Cola presented part or all of "The Future Belongs to Sprite" to representatives of eleven of these "cross-franchise" bottlers. Based on these facts, we find that the Coca-Cola presentation was specifically intended to influence consumers to buy its product, and we also find that the presentation was disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the soft drink industry.

Seven-Up, 86 F.3d at 1386 (footnotes omitted).

Since the false statements at issue here were disseminated orally to five persons, who arguably were members of the relevant purchasing public, and the relevant purchasing public, as identified by plaintiff, included hundreds of potential or actual customers, no reasonable jury could find the misrepresentations were sufficiently disseminated. Under these circumstances, the false statements cannot constitute commercial advertising or promotion.[12] On this alternative

---

[12] A review of the parties' submissions and the evidence put forward by plaintiff reveals that the thrust of its argument is plaintiff's complaint about its inability to do business with defendants' clients even though they do business with companies that operate like Premier (i.e., SmartComp, a direct competitor of Premier) ECF No. 104,

19

ground, the motion for partial summary judgment with respect to count V of the complaint must be granted in favor of defendants. The disputes in this case must be resolved under the state law claims.

**B. State Law claims**

Given that this court denied the only claim over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over plaintiff's Pennsylvania law causes of action pursuant to 28 U.S.C. § 1367(c)(3). Under 28 U.S.C. § 1441(c), this court has the authority to "remand all matters in which State law predominates." Since this case was removed from the Court of Common Pleas of Allegheny County, Pennsylvania, the court will deny without prejudice the motion for partial summary judgment with respect to the business libel claim and will remand plaintiff's state law causes of action to that court.

**Conclusion**

Because summary judgment must be granted in favor of defendants on the only federal claim in this case, the court need not retain jurisdiction to hear the remaining state law claims, including the business libel state law claim (count VI). See 28 U.S.C. § 1367(c)(3). The motion for partial summary judgment with respect to the business libel claim will be denied without prejudice. All plaintiff's claims asserted under state law will be **REMANDED** to the Court of Common Pleas of Allegheny County, Pennsylvania **FORTHWITH**. An appropriate order will be entered.

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Court Judge

Dated: March 28, 2012

---

¶¶ 122, 164, 174, 179, 236. Plaintiff, however, cites no authority for the proposition that defendants have to do business with them and that their refusal to do so qualifies as a Lanham Act violation.